IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

MELISSA BAKER CARTWRIGHT, )
)
Plaintiff, )
)
vs. ) No.    3:12-cv-00805
) JUDGE NIXON/BROWN
MICHAEL ASTRUE, )
COMMISSIONER OF )
SOCIAL SECURITY )

Defendant

**To: The Honorable John T. Nixon, Senior United States District Judge**

<u>Report and Recommendation</u>

This action was brought under 42 U.S.C. §§ 405(g), 1383(c)(3) to obtain judicial review of the final decision of the Social Security Administration ("SSA") upon an unfavorable decision, by the SSA Commissioner ("the Commissioner"), regarding plaintiff's application for Disability Insurance DIB ("DIB") under Title II of the Social Security Act and Title XVI of the Supplemental Social Income Act ("SSI").  42 U.S.C. §§ 416(i), 423(d), 1382(c).  For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record be **DENIED** and the Commissioner's decision be **AFFIRMED**.

## I.   <u>PROCEDURAL HISTORY</u>

Melissa Baker Cartwright ("Cartwright") filed for DIB under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416 and 1382, on February 18, 2009.  (Administrative Record ("A.R.") p. 126)  Cartwright's claims were founded upon diagnosis of bipolar disorder, type 1, with psychotic features.  (A.R. p. 220)  Cartwright's initial request was denied on May 8, 2007 and her request for reconsideration was denied on July 30, 2009.  (A.R. pp. 55-9, 67-70)

Subsequent to Cartwright's request, a hearing was conducted before an Administrative Law Judge ("ALJ"), Donald E. Garrison, on November 30, 2010 at which time Cartwright amended her claim to DIB to a closed period of time extending from October 1, 2008 through August 17, 2010. (A.R. pp. 27-46, 220) Present for the hearing were Cartwright, her attorney David Downard, vocational expert Michelle McBroom-Weiss ("VE"), and Medical Expert Philip Toops. (A.R. p. 29)

The ALJ denied Cartwright's application for DIB on December 10, 2010 and Cartwright requested review of the ALJ's determination on February 11, 2011. (A.R. pp. 7-8, 10-22) The SSI Appeals Council denied Cartwright's request for review of the ALJ determination on June 4, 2012. (A.R. pp. 1-3) Thus, the ALJ's determination constituted the final determination of the Commissioner at that time.

The plaintiff brought this action in district court on August 3, 2012 seeking judicial review of the Commissioner's decision. (Docket Entry ("DE") 1) The defendant filed an answer and a copy of the administrative record on October 15, 2012. (DE 9,10) Thereafter, the plaintiff moved for judgment on the administrative record on November 14, 2012 (DE 12), to which the defendant filed a response on January 14, 2013 also moving for judgment on the administrative record. (DE 15)

This matter is properly before the court.

## II. THE RECORD BELOW

### A. Medical Evidence

The medical evidence submitted by Cartwright in support of her claim to DIB under the SSI consists of the case notes of Dr. Franklin Drummond, Cartwright's treating physician, and his medical evaluation. In opposition, the Agency submitted the medical evaluations of three

consulting experts—Dr. Robert Doran, a clinical psychologist, Dr. George Davis, Ph. D, and Dr. Mason D. Currey Ph. D.  At the hearing before the ALJ, only the testimony of Cartwright and the Vocation Expert ("VE") was received.

## 1. Dr. Drummond's case notes and medical opinion

Cartwright was diagnosed with bipolar disorder, type I, with psychotic features and polysubstance dependence in May of 2001 at Vanderbilt Psychiatric Hospital.  (A.R. p. 220) Cartwright's treatment history for bipolar disorder was intermittent until October 2007 when she was referred to the Mental Health Cooperative ("MHC").  (A.R. p. 358)  Cartwright was treated by MHC from October 2007 throughout the period of this claim and review.  (A.R. p. 358)

At the intake screening, Cartwright claimed that she "had difficulty holding a job because of problems focusing," suffered from a diminished appetite, anxiety, lack of sleep, poor concentration, "racing thoughts, mood swings, and increased energy."[1]  (A.R. p. 358) Cartwright also claimed that she suffered from bouts of depression during which she self-isolated.  (A.R. p. 358)  The assessing caseworker noted that while Cartwright's mood was euphoric and she had trouble concentrating, Cartwright was alert and properly oriented, had an "appropriate affect, appearance, thought flow, and" intellect and judgment.[2]  (A.R. p. 358)

Based upon Cartwright's complaints and the caseworker's observations, Cartwright was assessed as having moderate to marked difficulties in all four clinically related groups[3] ("CRG")

---

[1]     It is stressed that all of the symptoms noted in MHC's case notes are the product of Cartwright's claims during her treatment.  The record below, other than the assessments provided by the Agency's consulting experts, is devoid of any objective testing to determine the exact nature and extent of Cartwright's disability or the severity of her symptoms.  Further, although MHC routinely tested Cartwright's blood to determine whether the prescribed medication was at therapeutic levels, there is no analysis of those tests included in the record. (A.R. pp. 472-84).

[2]     Affect, in psychological terms, is a gauge of how an individual responds to external stimuli.   *See* http://en.wikipedia.org/wiki/Affect_(psychology)

[3]     Clinically related groups are used to evaluate the impact of a mental disorder on a claimant in four areas:  1) activities of daily living; 2) interpersonal functioning; 3) concentration, task performance, and pace; 4) adaptation to change.  In each category, a clinician—a CM, social worker, or treating physician—will assess

and a global assessment of functioning ("GAF") at 45.[4] (*Id.*) The caseworker's impression was that Cartwright experienced: 1) moderate difficulty engaging in normal daily activities; 2) moderate difficulty when interfacing with and relating to others, 3) marked difficulty with concentration, task performance, and pace; and 4) moderate difficulty adapting to change. (A.R. pp. 355-7, 358-9) NHC assigned a case manager ("CM") to Cartwright's case, recommended counseling for substance abuse, and began Cartwright on a drug regimen to control the symptoms and manifestations of bipolar disorder, type I. (A.R. p. 362)

Overall, Cartwright tolerated the drug therapy well and, although she experienced weight gain problems throughout (A.R. pp. 370, 375, 378, 383, 387, 389, 398, 402, 413, 424, 426), and gastrointestinal problems and headaches initially (A.R. p. 370, 375, 378, 399), she reported many improvements in her symptoms when taking her medications consistently. (A.R. pp. 363-430) Her mood was generally good, her appetite, energy, and sleep habits improved as did her concentration, memory, and focus. (A.P. p. 370, 375, 378, 383, 387, 398, 401, 413, 424, 426)

Cartwright's CM and her treating physician, Dr. Franklin Drummond,[5] noted that the pace of her speech improved, her affect was consistently appropriate to "bright," she was adequately to well groomed, she maintained good hygiene, was cooperative and responsive to questioning, her intelligence and judgment appeared normal and that she was able to care for herself and her finances. (A.R. pp. 370, 375, 378, 383, 387, 398, 409, 413, 418, 426, 428, 432,

---

the difficulty that a claimant has as none, mild, moderate, marked, or extreme based upon a subjective determination of the symptoms presented.

[4] Global Assessment of Function is "a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). A GAF score in the range of 40-50 represents serious symptoms resulting in marked difficulty, and a score in the range of 50-60 represents moderate symptoms. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders p. 32 (4th Ed. 1994)

[5] Dr. Drummond's name does not appear as a care provider on MHC's Medication Management records until March 14, 2008. (A.R. p. 401) Jennifer Behnke or Cynthia Barrett—licensed nurse practitioners working at MHC—are listed as the care provider on many of these records. The Magistrate Judge concludes, without deciding, that the MD assessment on all such forms is attributable to Dr. Drummond. (A.R. pp. 471-2, 524-5)

434, 436, 438)  Cartwright utilized the mass transit system, attended doctor's appointments, job interviews, drug counseling, she walked for exercise, socialized with her son and daughter, and had lunch with a friend each Thursday.  (A.R. pp. 364, 372, 385, 389, 391-97, 399-400, 409)

Even though she became "anxious at times, especially when thinking about the future" (A.R. p. 413), she continually sought employment (A.R. pp. 363, 368, 371, 428), alternatives to living at the Nashville Rescue Mission-Family Life & Hope Center for Women ("FLC") through section 8 housing (A.R. p. 389, 397, 399, 416, 418, 421, 442), and applied for food stamps to supplement her diet (A.R. pp. 385, 389, 391-92).  While on her medications, Cartwright maintained employment on two separate occasions.

Dr. Drummond consistently noted that Cartwright's symptoms were in check while on medication and that her concentration, memory, and focus were all improved.  (A.R. pp. 370, 375, 378, 383, 387, 398, 409, 413, 418, 426, 428, 432, 434, 436, 438)  According to Dr. Drummond's case notes, Cartwright's mood was "great," she was doing well in her job, and that she "ha[d] been making gains in her life" although she was required to "refresh on the Dewey decimal system and pass tests about book locations" in her work at the library.  (A.R. pp. 438, 443)

Between November of 2007 and August of 2010, Cartwright complied intermittently with Dr. Drummond's prescribed course of treatment.  When off her Medications, Cartwright reported "irritability, mood lability,[6] crying spells, hopelessness, manic episodes which have racing thoughts, pressured speech, irrational behavior, spending sprees, can't slow down, [inability to] sleep."  (A.R. p. 605)  However, when she was compliant with her medications, Cartwright consistently reported that she was "much better with no current depression, anxiety, or

---

[6]     Lability is defined as "emotional instability; rapidly changing emotions."  *See* Dorland's Illustrated Medical Dictionary 994 (32nd Ed. 2012)

irritability" and she was "coming down to earth" after having taken her medications consistently. (A.P. p. 550)

On August 17th of 2010, Dr. Drummond noted that Cartwright had been compliant with her medications since March, and, as a result, her sleep averaged 6-8 hours . . . [and her] mood was pretty good with no problems." Dr. Drummond simply noted that Cartwright was "doing well." (A.R. p. 523)

**2. Assessment of the Agency's consulting experts**

On April 17, 2009, Cartwright was seen by Robert N. Doran M.A., a licensed clinical psychologist, ("Dr. Doran") in his offices in Madison. (A.R. pp. 489-93) Dr. Doran's report includes the following synopsis of his examination:

MENTAL STATUS *I* TEST RESULTS/ BEHAVIOR/ VALIDITY:
Ms. Cartwright was oriented to person, place, time, and situation. She was cooperative, put forth mood congruent. Ms. Cartwright reported that she attempted to harm herself "when she was in her 30's, by smoking as much cocaine as she could." She stated that she is in no current danger of harming herself or others. She indicated that "every now and then that night, she thinks she hears music, it is nothing bad, and it does not bother her." There was no indication of psychosis during the evaluation. Her insight is intact. Her judgment and impulse control appear to vary with her mood. Currently, her judgment is intact.

In terms of cognitive functioning, Ms. Cartwright exhibited knowledge of current events related to "the economy." She named the current president of the United States and his predecessor. She attempted serial sevens, stopping after the first calculation. She spelled the word "world" forward and backward. She recalled two of three objects after one minute and five minutes. She named the colors of the American flag. She repeated six digits forward and four in reverse. She described how steam and fog are similar. She defined the word, ponder. She described a thermometer. She cited valid reasons why certain professions require licensure and why taxation is necessary. She calculated multiplication and division problems. It is my impression that Ms. Cartwright is of average intellectual functioning.

(A.R. pp. 490-1)

Doran concluded from his interaction with Cartwright that she experienced mild limitations with memory and moderate limitations with sustained concentration and persistence,

interpersonal interactions, and adaptation to change.  (A.R. p. 492)  Doran assessed Cartwright's GAF score at 55.  (A.R. p. 491)  These findings were mirrored in the opinions of two licensed psychiatrists.  Dr. George T. Davis, Ph.D. reviewed the case file, including Dr. Doran's findings, and concluded that Cartwright's impairments were mild to moderate.  (A.R. pp. 494-511)  Dr. Davis's completed mental residual functional assessment opined that Cartwright experienced mild limitations except maintaining social functioning or concentration, performance, and pace (A.R. pp. 508-9)

Key to Dr. Davis findings was that Cartwright experienced moderate difficulties in several subcategories: 1) maintaining concentration and focus for extended periods of time; 2) showing up for work consistently and working within a schedule; 3) maintaining focus and concentration when working in close proximity to others; 4) working for sustained periods of time without the need for repeated break periods; 5) interacting with the public and co-workers; 6) accepting criticism; and 7) adapting to changes in the work setting.  (Id.)  Dr. Mason D. Currey, Ph. D concurred with Dr. Davis' findings and opinion based upon his own review of the record.

### 3.  Testimonial Evidence

On November 30, 2010, Cartwright testified that Dr. Drummond had prescribed drugs to control her symptoms and, when asked if she took her "medications the way [she] was supposed to," Cartwright answered that she had.  (A.R. p. 34, 40)  However, Cartwright testified that, initially, the drugs only worked intermittently.  (A.R. p. 34)  She claimed that even though she took her medications as prescribed, she experienced unexplained setbacks once a year.  (A.R. p. 34, 39-40)  According to Cartwright, however, the drugs had "been a tremendous help" recently

and, although not completely healed, she was doing better than she had since beginning treatment. (A.R. p. 37-8.)

When questioned about her work history, Cartwright responded that her most recent employment was as a "pager" at the library. She worked there for three months, but stopped going to work because, even though she took her medications as directed, her medications were "not working as well" and she felt "overwhelmed and confused." (A.R. p. 32-3) When asked why she had not been working or attempting to work since that time, Cartwright responded that she was waiting on the final disability determination. (A.R. p. 35)

The ALJ next consulted with the vocational expert to determine if there were any jobs in the national economy that Cartwright was capable of performing. The ALJ asked the VE to assess the availability of work in the national economy based upon the following assumptions:

> "Assume a person of the claimant's age, education and work experience. Assume I find that such a person is able to work at any exertional level. Assume the person's able to understand, remember and carry out short and simple instructions and make judgments on simple work related decisions. Assume occasional interaction with the public, assume no production rate pace, quota assembly line jobs or jobs with changing work procedures or requirements but instead simple, routine tasks."

(A.R. pp. 42-3) The VE responded that such an individual would be capable of performing work as a housekeeper, marker, or a laundry folder. (A.R. p. 43-4) The VE further testified that an individual with a GAF score below 51 would not be able to find such employment, but that an individual with a GAF score above 50 would.

### III. ANALYSIS

**A. Standard of Review**

The District Court's review of the Commissioner's final decision regarding a denial of DIB is limited to a determination of whether those findings are supported by substantial evidence in the record, and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v.*

*Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require that all of the evidence in the record preponderate in favor of the ALJ's determination, but does require more than a mere scintilla of evidence underpinning a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [the evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). However, "failure to follow the rules" that the Agency promulgates to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's" determination is otherwise supportable. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009))

## A. Determination of a "disability" under the SSA

To substantiate an entitlement to DIB under the SSI, a claimant must demonstrate "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(a)(1)(E), (d)(1)(A). Determination of a "disability" under the SSA's procedures requires a five-step sequential assessment of whether: 1) a claimant has engaged in substantial gainful activity during the period under consideration; 2) the claimant has a severe medically determinable physical or mental impairment that significantly limits her ability to do basic work activities; 3) the claimant has a severe impairment that meets or equals one of the listings in Appendix I Subpart P of the regulations and meets the durational requirements; 4) the claimant's impairment prevents her from doing her past relevant work; and, if so, 5) whether it is

impossible for the claimant to transition to other work.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), (b)-(g).  Only steps two and three of this analysis are pertinent to Cartwright's claims here.

If the ALJ determines that the medical evidence demonstrates a "medically determinable mental impairment" at step two of the process, he must then, at step three, determine how the mental impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. §§ 404.1520a(b)(1).  In doing so, the ALJ must consider the claimant's: 1) ability to engage in the activities of daily living; 2) ability to function in social settings; 3) ability to concentrate, work persistently, or at a consistent pace; and 4) periods of decompensation.[7]  20 C.F.R. §§ 404.1520a (c)(2)-(3).

A claimant's functional limitations are conclusive of disability if the ALJ finds marked to extreme limitations in two of the first three categories (20 C.F.R., pt. 404, subpt. P, app. 1, § 12.08(B)), or marked to extreme limitations in one of the first three categories accompanied by three periods, lasting two weeks or more, of reduced functionality in a one year period of time.  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00(C)(4).  The ALJ in Cartwright's case determined that Cartwright was not "disabled" under the SSI after assessing the medical history contained in the record against these standards.

**B.  Ruling of the ALJ**

In an unfavorable ruling issued December 10, 2010, the ALJ found that Cartwright was not "disabled" within the parameters of the SSI.  (A.R. pp. 13-22)  In step three of the process, the ALJ found that the functional impact of Cartwright's dipolar disorder "was not severe enough, either singly or in combination to meet or medically equal the requirements set forth in the listing of Impairments. Appendix I to Subpart P, Regulation No. 4."  (A.R. p. 15)

---

[7]    Decompensation connotes an exacerbation[] or temporary increase[] in symptoms or signs accompanied by a loss of adaptive functioning."  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00(C)(4).

Further, at step 4, the ALJ concluded that Cartwright:

> "ha[d] the residual functional capacity to perform a full range of work at all exertional levels; and is able to understand, remember and carry out short and simple instructions; make judgments on simple work-related decisions; have occasional contact with the public; with no ability to perform production rate pace quota assembly line work or work requiring changes in work procedures/requirements."

In making these assessments, the ALJ found that the opinion of Cartwright's treating physician was not entitled to "significant weight" because Dr. Drummond's opinion contradicted itself and was contradicted by the record as a whole. (A.R. pp. 18-19). The ALJ "accorded significant weight" to the opinions of SSA's consulting physicians because they were consistent with the record. (A.R. p. 19)

## IV. CLAIMS OF ERROR

In her first assignment of error, Cartwright asserts that the ALJ erred by not according the opinion of Dr. Drummond "proper" weight. (Plaintiff Br. p. 6) Cartwright argues that Dr. Drummond's medical opinion is supported by the record and is binding upon the Agency. (Id.)

Second, Cartwright asserts that the ALJ incorrectly relied on GAF scores in assessing Cartwright's functional ability. (Plaintiff Br. pp. 8-9) Cartwright argues that, in discounting the GAF scores below 50, the ALJ "cherry picked" evidence from the record to support his conclusions. (Plaintiff Br. at p. 8) For the reasons specified below, the Magistrate judge finds little merit in Cartwright's arguments.

### A. Dr. Drummond's medical opinion was not afforded "proper" weight

Cartwright argues that, because of the longstanding doctor-patient relationship, the ALJ was bound by Dr. Drummond's assessment of her functional capacity under the treating physician rule ("the Rule"). (Plaintiff Br. pp. 6-8) However, Cartwright misconstrues the impact of the Rule on the discretion afforded the ALJ under SSI. As Cartwright notes, relevant

precedent of the Sixth Circuit Court of Appeals requires "complete deference" to the opinion of the treating physician *only* where "it is not contradicted." *Walker v. Secretary of H.H.S.*, 980 F.2d 1066, 1070 (6th Cir. 1992), *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (holding that a treating physician's opinion is only binding where the ALJ finds it "well supported by medically acceptable clinical and laboratory diagnostic techniques *and* not inconsistent with the other substantial evidence in the case record." (*emphasis added*)). This reasoning by no means binds the ALJ to a treating physician's opinion.

Rather, the ALJ is required to perform an independent assessment of the medical evidence to determine whether the treating physician's opinion is grounded in clinically acceptable methodology *and* whether it is substantially supported by the evidence submitted. 20 C.F.R. § 404.1527(c)(2). Further, where the treating physician's opinion is not deserving of controlling weight, the ALJ must weigh the reliability of that opinion to determine how much weight it is due. 20 C.F.R. § 404.1527(c); *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-6 (6th Cir. 2013). Key in this determination is the "length, frequency, nature, and extent of the treatment relationship, as well as the treating physician's area of specialty and the degree to which the opinion is consistent with the record as a whole." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Where the ALJ discounts the opinion of the treating physician and states: 1) the weight afforded to the treating source's opinion, 2) "good reasons" why the treating source's opinion was discounted; and 3) "good reasons" why the treating source's opinion was given the weight assessed, the finding of the ALJ is conclusive where supported by substantial evidence. *Gayheart*, 710 F.3d at 376. According to the Agency's regulations, even when a treating physician's opinion is not entitled to controlling weight it is still generally entitled to significant

weight. 20 C.F.R. § 404.1527. However, the treating physician's opinion is only "evidence . . . on the nature and severity" of impairment that the ALJ assesses in his determination of whether a disability exists. *Id.* at § 1527(d)(1),(2)

On August 17, 2010, Dr. Drummond submitted a Medical Source Statement of Ability to do Work-Related Activities detailing Cartwright's limitations in the areas of interest under 20 C.F.R. §§ 404.1520a (c)(2)-(3).[8] According to Dr. Drummond's opinion, Cartwright was "instable, unable to concentrate or focus due to her heavy medication" and had "poor interpersonal skills due to her mood lability." (A.R. pp. 514-16) Thus, according to Dr. Drummond, the impact of bipolar disorder, type I, on Cartwright was to impose: 1) marked difficulties understanding and remembering simple instructions and carrying out complex instructions, interacting with supervisors and co-workers, and responding appropriately to usual work routines and changes in those routines; 2) extreme difficulties carrying out simple instructions, and making judgments on both simple and complex work-related decisions, and interacting with the public; and 3) *moderate* difficulties remembering complex instructions.[9] (A.R. pp. 514-16)

The ALJ found, however, that Dr. Drummond's opinion was directly contradicted by the evidence contained in the record. (A.R. p. 20) According to the ALJ, the record reflects that Cartwright "consistently reported doing well with medications[] with some occasional increase

---

[8] The Magistrate Judge notes that, of the five GAF assessment included within the evidence, the only one to which the Rule applies is the one completed on August 17, 2010. The other four were performed by Cartwright's CM or another clinician who worked for MHC. Only licensed physicians and psychologists are sources recognized to "establish an impairment" and are within the Rule. 20 C.F.R. § 404.1513(a)(1). The opinions and case notes of "public and private social agency personnel" are of use to an ALJ *only* as evidence as to the "severity of an impairment and how it affects [a claimant's] ability to work." Id. at § 404.1513(d)(3). Thus, only Dr. Drummond's opinion is considered here.

[9] Although the ALJ relied in part on the inconsistency of Dr. Drummond's determination, this alone is not a sufficient basis, under the reasoning in *Gayheart*, to reject the treating physician's opinion. *Gayheart*, 710 F.3d at 376-8.

in symptoms . . . mainly due to the stress of lack of finances or when off medications." (A.R. p. 18) Based upon his review, the ALJ found that the impact of that bipolar disorder, type I, imposed only a "mild restriction of activities of daily [living]; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace on Cartwright's functionality." (A.R. p. 16)

In assessing the weight to be afforded to Dr. Drummond's opinion, the ALJ noted the degree of conflict between the evidence contained in the record and Dr. Drummond's opinion of the severity of Cartwright's limitations. (A.R. pp. 17-21) Accordingly, the ALJ found that Dr. Drummond's opinion should "not [be] given significant weight" because it was self-contradictory, and "there is little if any rationally discernible pattern or connection between the limitations assessed, whether narratively or by GAF rating, and what the case notes say." (A.R. p. 20) As demonstrated below, these findings are well supported.

During the pre-claim period, the ALJ correctly noted, that Cartwright's "sleep had improved, her energy level was normal and her concentration, memory, and focus had all improved" in response to the medications prescribed by Dr. Drummond. (A.R. p. 18) Notwithstanding the contrary assessments of Dr. Drummond and Cartwright's CM, as demonstrated *supra* at pp. 3-8, the record clearly shows marked improvements in all functional levels while Cartwright complied with Dr. Drummond's prescribed treatment.

Contrary to Dr. Drummond's assessment of August 17, 2010 upon which Cartwright must rely, (see n.15 above at p. 13), the prescribed medications did not produce serious deleterious effects. (A.R. p. 514-15) Cartwright initially reported only minimal side effects from the psychotropic drugs, and those gradually abated. (*supra* at p. 4) These diminished side effects continued throughout her treatment. Dr. Drummond noted on August 17, 2010, the same

day that he completed the medical source statement referenced above, that Cartwright reported no side effects from her medications other than weight gain. (A.R. pp. 523, 28) Rather than continued mood lability, poor focus and poor interpersonal skills as Dr. Drummond reports, Cartwright exhibited the ability to function remarkably well in all areas.

As the ALJ noted, Cartwright worked two jobs during this period. Contrary to Dr. Drummond's opinion and that of her CM (A.R. pp. 431, 559, 595), Cartwright reported no inability to concentrate while she was on her medications. Similarly, claims by Dr. Drummond that Cartwright could not focus or concentrate well enough to work are also contradicted by the record. (Id.) As the ALJ correctly noted, the record clearly shows that Cartwright lost her job due to "an altercation" with a co-worker rather than to an inability to concentrate.[10] (A.R. p. 18)

The record also clearly shows that Cartwright accepted increased responsibility and interfaced with the public and co-workers without complaint. (A.R. pp. 401, 409, 413) When employed at the Library, Cartwright was diligent and conscientious with her work schedule, focused on working all hours that she was scheduled to work, and was able to handle increased responsibility and pass tests given to her by her supervisor without incident. (A.R. p. 443-5)

Cartwright was not paralyzed when faced with change as Dr. Drummond and Cartwright's CM opined so long as she took her medications as prescribed. Rather, as demonstrated *supra* at p. 5, Cartwright was forward thinking and planning for an independent life with her husband after his release from prison. She applied for section 8 housing, was looking for apartments, began receiving food stamp, and, although she expressed some trepidation over moving out of the mission in April of 2008, Cartwright successfully transitioned to the Madison Inn with her husband once he was released from prison.

---

[10]   The Magistrate judge also notes that only Nicole Rucker, Cartwright's final CM, is the only individual from MHC that contacted one of Cartwright's employers. She did so in June of 2010. (A.R. p. 537)

In his May 28, 2008 case notes, Dr. Drummond noted that "living independently with her husband [was] a positive change" in Cartwright's life.  (A.R. p. 426)  Cartwright's CM observed on June 23, 2008 that Cartwright was in "good spirits" at her new home and that she kept the "living quarters [] very clean and neat with a home atmosphere."  (A.R. p. 428)  Also, MHC's case notes reveal that Cartwright refused to move to an apartment in late June of 2008, not because of an inability to adapt to change, but because her husband preferred to stay in Madison and the couple could not afford it at the time.  (A.P. p. 430)  These improvements halted, not because Cartwright's medication stopped working as she repeatedly claimed, but, rather, because Cartwright stopped taking her medications consistently as the ALJ correctly found.

Unlike during the pre-claim period when Cartwright missed her medications on two brief occasions (A.R. pp. 432, 442), the ALJ noted two distinct intervals during the claim period when Cartwright failed to follow the treatment regimen for extended periods of time.  (A.R. pp. 18-19)  As the ALJ correctly noted, the record clearly shows that each time Cartwright discontinued her medications her symptoms from dipolar disorder returned but quickly came under control when she returned to taking her medications consistently.

Cartwright first deviated from her treatment regimen in November of 2008.  (Id.)  The record shows that between November of 2008 and February of 2009 Cartwright complied intermittently with her medications.  (A.R. pp. 445-55)  During November, December and January Cartwright reported being off of her medications for a week during each month.  (A.R. pp. 446, 455-6, 462)  By January 13th of 2009, as the ALJ noted, Cartwright's symptoms had returned.  (A.R. p. 462)  Cartwright complained of paranoia, racing thoughts, depression, and moodiness.  (A.R. p. 462)

By March 11th, Cartwright was consistently taking her medications and stated that she "was doing very well since getting back" on them. (A.R. p. 603) She was still moody and struggling with crying spells and racing thoughts, but her sleep was better and she was doing "a little better" overall. (A.R. p. 604) Cartwright consistently took her medications from March until June, with the exception of 1 week in May when she claimed that she could not afford them (A.R. pp. 593), and reported that her medications were "helping tremendously" on June 4th. (A.R. p. 591)

By mid-July of 2009, however, the record demonstrates that Cartwright was again taking her medications intermittently. Cartwright reported being off of her medications for the last two weeks of July and the first week of August due to a problem with MHC's voucher system. (A.R. p. 579) She stopped attending her scheduled appointments with her CM and Dr. Drummond, and reported that her symptoms had returned. (A.R. p. 580-83) Cartwright again reported being off her medications for a week on September 18th but was consistent with her medications from that time until October 13th when she reported doing "good overall" and feeling "relatively stable." (A.R. p. 571) Cartwright's symptoms improved further until January of 2010 when she again stopped taking her medications again for six weeks. (A.R. p. 553)

She reported being "anxious, irritable, and depressed [due to] being off her med[s]." (Id.) However, after taking her medications for three weeks, Cartwright reported on March 9th that she "was much better with no current depression, anxiety, or irritability." (A.R. p. 550) Similarly, Cartwright continued taking her medications through the remainder of the claim period and repeatedly reported improvements in her symptoms through August 17th, the end of the disability period claimed. (A.R. 523, 528, 530, 538, 543, 546, 550)

During this same period, as the ALJ noted, Cartwright even worked full time for an employment agency at night, and was able to save money from her job. (A.R. p. 19) Further, as Cartwright's attorney stated during the hearing (A.R. p. 41), on the same day that he completed the medical source statement indicating that Cartwright was severely to extremely impaired, Dr. Drummond noted in his case notes that Cartwright was "doing well [and that her] major concern [was] her weight gain." (A.R. p. 523, 528)

Contrary to the ALJ's findings with regard to Dr. Drummond's opinion, the ALJ found that the opinions of the Agency's three medical experts were consistent with the record as a whole. (A.R. p. 20) Accordingly, the ALJ found that these opinions are due "significant weight." (Id.) Similarly to the ALJ's finding with regard to Dr. Drummond's opinion, the ALJ's finding in regard to the SSA's experts is supported by substantial evidence.

When Cartwright arrived for her appointment with Dr. Doran, she had been taking two of her three medications consistently for the previous month. (A.R. p. 598) However, even when compliant with only two of her three medications, Dr. Doran observed that Cartwright performed adequately to the battery of objective tests administered.[11] (A.R. pp. 490-1) These objective tests, when coupled with the record, provide significant support to Dr. Doran's assessment of Cartwright's limitations as mild to moderate. (A.R. pp. 491-92) Dr. Doran's assessment is further strengthened by the concurring opinion of the Agency's two licensed psychiatrists. (A.R. pp. 494-513)

---

[11] The Magistrate Judge notes that MHC administered no objective testing during Cartwright's treatment. Rather, MHC relied on the claims of Cartwright and the subjective observations of the CM, nurse practitioners, and Dr. Drummond himself.

The Magistrate Judge finds substantial evidence in the record supporting the ALJ's findings that Cartwright was able to function adequately while compliant with her medications, and that the opinion of Dr. Drummond was contrary to the medical evidence.[12]

## B. The ALJ impermissibly relied on GAF scores in the denial of DIB

Cartwright next argues that "the ALJ picked apart the medical evidence and pieced it together to work around his conclusion." According to Cartwright, without reliance only on the GAF scores above 50, the ALJ's determination would have favored her.

In regard to GAF scores, such a score is "a subjective determination that represents a clinician's judgment of the individual's overall level of functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). It is not a direct and objective indication of the impact a medical condition has upon a claimant's functionality, but, rather, is a subjective tool used by clinicians to indicate their perception of how a claimant is functioning at any moment in time. Yet, a GAF score "may be of considerable help to the ALJ in formulating the RFC . . . [but] it is not essential to the RFC's accuracy." *Id.* at 284; *see also* 65 Fed. Reg. §§ 50746, 50764-5 (2000). As such:

> "[t]he Commissioner has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings . . . [the] are not raw medical data and do not necessarily indicate improved symptoms or mental functioning."

*Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. 2007) (*internal citations and quotations omitted*).

In his decision of December 10, 2010, the ALJ included the following assessment of the GAF scores included in the medical record:

---

[12]   Although the ALJ did not address that Cartwright is not entitled to a finding of disability due to non-compliance with treatment protocols, the Magistrate Judge notes that, under the SSI, the ALJ is entitled to disregard any periods of disability arising from a claimant's failure to comply with her treating physician's prescribed course of treatment. 20 C.F.R. § 404.1530(b)

Throughout treatment, the claimant's Global Assessment of Functioning (GAF) Scores ranged between 42 and 55. The DSM-IV-TR (2000, p. 34) explains that GAF ratings in the range of 51 to 60 indicate "moderate symptoms" and 50 and below at least "serious symptoms" of mental impairment that typically preclude work. The mental health records also included clinically related group (CRG) summary assessments. Narrative ratings in the CRGs are assigned in the following generally functional areas: activities of daily (ADLs); interpersonal/social functioning; concentration, persistence and pace (CPP); and adaptation. These general areas are numerically rated as follows: I-extreme symptoms/limitations; 2-marked symptoms/limitations; 3-moderate symptoms/limitations; 4-mild symptoms/limitations; and 5-no symptoms/limitations. Despite the varying GAF scores, the ratings in the CRG's never varied from moderate limitations in ADLs and social functioning, and marked limitations in CPP and adaptation.

As a threshold matter, NP's, counselors and social workers are not "acceptable medical sources" under the Social Security Act for authoritative independent opinions relating to diagnoses and limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-documented contrary opinions from acceptable medical sources such as licensed physicians, psychiatrists and psychologists. 20 CFR 404.1513 and 416.913.

Additionally, GAF scores are not an assessment on the claimant's mental status and/or limitations (DSM-IV). They are used to track the clinical progress of an individual in global terms.

Reviewing the Mental Health Center's records establishes that there is little if any rationally discernible pattern or connection between the limitations assessed, whether narratively or by GAF rating, and what the actual treatment notes says. Consequently, the contradictory opinion from Dr. Drummond and the GAF ratings of 50 and below are not given significant weight, as they are equally unreliable, whether or not they came from an acceptable medical source.

(A.R. pp. 19-20)

These findings and observations directly follow the ALJ's analysis of the record discussed above. When taken in context, it is abundantly clear that the ALJ was not relying on the GAF scores contained within the record. Rather, the ALJ was stating the basis of his findings as he was required to do under the SSA's procedures. *See Gayheart*, 710 F.3d at 376. The ALJ correctly found that "there is little if any rationally discernible pattern or connection between the limitations assessed, whether narratively or by GAF rating, and what the actual treatment notes says." (A.R. p. 20)

## V.  CONCLUSION

The Magistrate Judge finds that the ALJ's determination of Cartwright's functionability when properly medicated is supported by substantial evidence in the record.  Further, the Magistrate Judge finds that, contrary to Cartwright's claims, the ALJ did not improperly rely on GAF scores included in the record.

## VI. RECOMMENDATION

For the reasons stated above, the undersigned recommends that the plaintiff's motion for judgment on the record (DE 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 5th day of September, 2013.


/s/Joe B. Brown
Joe B. Brown
Magistrate Judge